**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH FROEHLICH, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| OLIVIER RABILLER, ALLESANDRO GILI, PETER BRACKE, SEAN DEASON, and SU PING LU, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Joseph Froehlich ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, the investigation conducted by Plaintiff's counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Garrett Motion Inc. ("Garrett" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Garrett; and (c) review of other publicly available information concerning Garrett.

## NATURE OF THE ACTION

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired Garrett securities between October 1, 2018 and September 18, 2020, inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Garrett designs, manufactures and sells turbocharger, electric-boosting and connected vehicle technologies for original equipment manufacturers and the aftermarket.  In October 2018, the Company formed as a spin-off of the Transportation Systems business of Honeywell International Inc. ("Honeywell").

3.    On August 26, 2020, before the market opened, the Company disclosed that its "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers."  Garrett further stated that its "high leverage is exacerbated by significant claims asserted

by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and the tax matters agreement."

4.      On this news, Garrett's stock price fell $3.04 per share, or over 44%, to close at $3.84 per share on August 26, 2020, thereby damaging investors.

5.      On Sunday, September 20, 2020, Garrett announced that it had filed for Chapter 11 bankruptcy.

6.      On Monday, September 21, 2020, the New York Stock Exchange ("NYSE") announced that it would commence proceedings to delist Garrett's stock from the NYSE after the Company's disclosure that it had filed for bankruptcy.

7.      On this news, Garrett's stock began trading over-the-counter and closed at $1.76 per share on September 22, 2020, an over 12% decline from the closing price on September 18, 2020.

8.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) because of Garrett's agreement to indemnify and reimburse Honeywell for certain asbestos-related liability, the Company was saddled with an unsustainable level of debt; (ii) as a result, Garrett had a highly leveraged capital structure that posed significant challenges to its overall strategic and financial flexibility; (iii) as a result of the foregoing, Garrett's ability to gain or hold market share was impaired; (iv) as a result of the foregoing, the Company was reasonably likely to seek bankruptcy protection; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

13.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## RELEVANT NON-PARTY

14.      Garrett is a Delaware corporation with principal executive offices located at La Pièce 16, Rolle, Switzerland 1180.  Garrett's common stock traded in an efficient market on the NYSE under the symbol "GTX" until September 18, 2020, and has traded over-the-counter under the symbol "GTXMQ" since September 21, 2020.

## PARTIES

15.     Plaintiff, as set forth in the accompanying Certification, incorporated by reference herein, purchased Garrett securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Olivier Rabiller ("Rabiller") was the Company's Chief Executive Officer ("CEO") at all relevant times.

17.     Defendant Allesandro Gili ("Gili") was the Company's Chief Financial Officer ("CFO") from October 2018 to September 2019.

18.     Defendant Peter Bracke ("Bracke") was the Interim CFO from September 2019 to June 2020.

19.     Defendant Sean Deason ("Deason") has been the Company's CFO since June 2020.

20.     Defendant Su Ping Lu ("Lu") was the President of the Company when she signed the Registration Statement in connection with Garrett's spin-off from Honeywell.

21.     Defendants Rabiller, Gili, Bracke, Deason, and Lu (collectively "Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive

representations which were being made were then materially false and/or misleading.  Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Garrett designs, manufactures and sells turbocharger, electric-boosting and connected vehicle technologies for original equipment manufacturers and the aftermarket.   In October 2018, the Company formed as a spin-off of Honeywell's Transportation Systems business.

### Materially False and Misleading Statements Issued During the Class Period

23.     The Class Period begins on October 1, 2018, when the Company's stock began trading on the NYSE.  The registration statement corresponding to the spin-off, which was signed by Defendant Lu, was first filed on Form 10 on August 23, 2018, and amended on September 5, 2018.   The Form 10 contained generic, boilerplate representations regarding asbestos-related liability payments to Honeywell, stating, in relevant part[1]:

> ***We are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities.***
>
> In connection with the Spin-Off, we intend to enter into an Indemnification and Reimbursement Agreement (as defined below), pursuant to which we will have an obligation to make cash payments to Honeywell in amounts equal to 90% of Honeywell's asbestos-related liability payments and accounts payable, primarily related to Honeywell's legacy Bendix friction materials ("Bendix") business in the United States as well as certain environmental-related liability payments and accounts payable and non-United States asbestos-related liability payments and accounts payable, in each case related to legacy elements of the Business, including the legal costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts and, as may be applicable, certain other recoveries associated with such liabilities.
>
> The amount payable by the Company in respect of such liabilities arising in any given year will be payable in Euros, subject to a cap (denominated in Euros) equal

---

[1] Unless otherwise stated, all emphases herein are added.

to $175 million, calculated by reference to the Distribution Date Currency Exchange Rate. The cap shall be exclusive of any late payment fees up to 5% per annum.

\* \* \*

Honeywell's asbestos-related Bendix liability payments for the years 2017, 2016 and 2015, including any legal fees, were $223 million, $201 million and $193 million, respectively, and Honeywell's associated insurance receipts for 2017, 2016 and 2015 were $20 million, $37 million and $33 million, respectively.

In the event that Honeywell enters into a global settlement of all or substantially all of the asbestos-related Bendix claims in the United States, the Company will be obligated to pay 90% of the amount paid or payable by Honeywell in connection with such global settlement payment, less 90% of insurance receipts relating to such liabilities, and in such event, the Company will be required to pay an amount equal to the Distribution Date Currency Exchange Rate equivalent of $175 million per year until the amount payable by the Company in respect of such global settlement payment is less than an amount equal to the Distribution Date Currency Exchange Rate equivalent of $175 million. During that time, the annual payment by us to Honeywell of an amount equal to the Distribution Date Currency Exchange Rate equivalent of $175 million will be first allocated towards asbestos-related liabilities arising outside of the scope of the global settlement and environmental-related liabilities and then towards the global settlement payment. Payment amounts will be deferred to the extent that the payment thereof would cause a specified event of default under certain indebtedness, including our principal credit agreement or cause us to not be compliant with certain financial covenants in certain indebtedness, including our principal credit agreement on a pro forma basis, including the maximum total leverage ratio (ratio of debt to EBITDA, which excludes any amounts owed to Honeywell under the Indemnification and Reimbursement Agreement), and the minimum interest coverage ratio . . . . Further, pursuant to the Indemnification and Reimbursement Agreement, our ability to (i) amend or replace our principal credit agreement, (ii) enter into another credit agreement and make amendments or waivers thereto, or (iii) enter into or amend or waive any provisions under other agreements, in each case, in a manner that would adversely affect the rights of Honeywell under the Indemnification and Reimbursement Agreement, will be subject to Honeywell's prior written consent. This consent right will significantly limit our ability to engage in many types of significant transactions on favorable terms (or at all), including, but not limited to, equity and debt financings, liability management transactions, refinancing transactions, mergers, acquisitions, joint ventures and other strategic transactions. See "Certain Relationships and Related Party Transactions—Agreements with Honeywell—Indemnification and Reimbursement Agreement."

***This agreement may have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline***

CLASS ACTION COMPLAINT

*in net sales. The agreement may also require us to accrue significant long-term liabilities on our combined balance sheet,* the amounts of which will be dependent on factors outside of our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities. *As of December 31, 2017, we have accrued $1,703 million of liability in connection with Bendix-related asbestos, representing the estimated liability for pending claims as well as future claims expected to be asserted.* The liabilities related to the Indemnification and Reimbursement Agreement may have a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating our creditworthiness and the value of our securities. Accordingly, our access to capital to fund our operations may be materially adversely affected and the value of your investment in our company may decline. Moreover, the payments that we will be required to make to Honeywell pursuant to that agreement will not be deductible for U.S. federal income tax purposes.

Plainly, this risk warning was a generic, catch-all provision that was not tailored to Defendants' actual known risks regarding the unsustainability of Garrett's level of debt or its highly leveraged capital structure that posed significant challenges to its overall strategic and financial flexibility, much less that the Company was reasonably likely to seek bankruptcy protection.

24.     The Form 10 also contained generic, boilerplate representations regarding a material weakness in Garrett's internal control over financial reporting, stating, in relevant part:

*There is a material weakness in internal control over financial reporting related to the estimation of our liability for unasserted Bendix-related asbestos claims which has resulted in a restatement of our previously issued financial statements.*

Our financial statements are derived from the consolidated financial statements and accounting records of Honeywell. In the course of preparing for our Spin-Off from Honeywell, Honeywell reassessed its accounting for unasserted Bendix-related asbestos claims to reflect the epidemiological projections through 2059 in its measurement of such liability. This matter also affected our financial statements. As a result of this error, the Company's Combined Financial Statements were restated as described in Note 1, and a material weakness in internal control over financial reporting was identified related to a deficiency of internal control for the estimation of probable and reasonably estimable liability for unasserted Bendix-related asbestos claims.

This risk warning, too, was plainly a generic, catch-all provision that was not tailored to Defendants' actual known risks regarding the unsustainability of Garrett's level of debt or its

CLASS ACTION COMPLAINT

highly leveraged capital structure that posed significant challenges to its overall strategic and financial flexibility, much less that the Company was reasonably likely to seek bankruptcy protection.

25.    On September 14, 2018, Garrett filed a Form 8-K with the SEC, wherein it disclosed that the Company had entered into certain agreements with Honeywell.  Specifically, regarding the indemnification and reimbursement of asbestos-related liabilities, the Company stated, in relevant part:

*Indemnification and Reimbursement Agreement*

Pursuant to the Indemnification and Reimbursement, a subsidiary of the Company has an obligation to make cash payments to Honeywell in amounts equal to 90% of Honeywell's asbestos-related liability payments and accounts payable, primarily related to the Bendix business in the United States, as well as certain environmental-related liability payments and accounts payable and non-United States asbestos-related liability payments and accounts payable, in each case related to legacy elements of Garrett's turbo business, including the legal costs of defending and resolving such liabilities, less 90% of Honeywell's net insurance receipts and, as may be applicable, certain other recoveries associated with such liabilities. The amount payable by such subsidiary in respect of such liabilities arising in any given year will be subject to a cap of an amount equal to the Euro-to-U.S. dollar exchange rate (to be determined by Honeywell as of a date within two business days prior to the completion of the Spin-Off) (the "Distribution Date Currency Exchange Rate") equivalent of $175 million (exclusive of any late payment fees up to 5% per annum).

In the event of a global settlement of all or substantially all of the asbestos-related Bendix claims in the United States, our subsidiary will be obligated to pay 90% of the amount paid or payable by Honeywell in connection with such global settlement payment, less 90% of insurance receipts relating to such liabilities, and in such event, our subsidiary will be required to pay an amount equal to the Distribution Date Currency Exchange Rate equivalent of $175 million per year until the amount payable by our subsidiary in respect of such global settlement payment is less than an amount equal to the Distribution Date Currency Exchange Rate equivalent of $175 million. During that time, the annual payment by our subsidiary to Honeywell of an amount equal to the Distribution Date Currency Exchange Rate equivalent of $175 million will be first allocated towards asbestos-related liabilities arising outside of the scope of the global settlement and environmental-related liabilities and then towards the global settlement payment.

Payment amounts will be deferred to the extent that the payment thereof would cause a specified event of default under certain indebtedness, including our principal credit agreement, or cause us to not be compliant with certain financial covenants in certain indebtedness, including our principal credit agreement on a pro forma basis, including the maximum total leverage ratio (ratio of debt to EBITDA, which excludes any amounts owed to Honeywell under the Indemnification and Reimbursement Agreement), and the minimum interest coverage ratio. In each calendar quarter, our ability to pay dividends and repurchase capital stock in such calendar quarter will be restricted until any amounts payable under the Indemnification and Reimbursement Agreement in such quarter (including any deferred payment amounts) are paid to Honeywell and we will be required to use available restricted payment capacity under our debt agreements to make payments in respect of any such deferred amounts. Payment of deferred amounts and certain other payments (which are not expected to be material) could cause the amount our subsidiary is required to pay under the Indemnification and Reimbursement Agreement in any given year to exceed an amount equal to the Distribution Date Currency Exchange Rate equivalent of $175 million per year (exclusive of any late payment fees up to 5% per annum). All amounts payable under the Indemnification and Reimbursement Agreement will be guaranteed by certain of our subsidiaries that act as guarantors under our principal credit agreement. The ability for certain of our subsidiaries to make distributions in respect of and/or provide guarantees under the Indemnification and Reimbursement Agreement will be limited by any defenses generally available to guarantors (including, without limitation, those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, thin capitalization, distributable reserves, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other legal requirements under applicable law. Under the Indemnification and Reimbursement Agreement, we are subject to certain of the affirmative and negative covenants to which we are subject under our principal credit agreement. Further, pursuant to the Indemnification and Reimbursement Agreement, our ability to (i) amend or replace our principal credit agreement, (ii) enter into another credit agreement and make amendments or waivers thereto, or (iii) enter into or amend or waive any provisions under other agreements, in each case, in a manner that would adversely affect the rights of Honeywell under the Indemnification and Reimbursement Agreement, will be subject to Honeywell's prior written consent. This consent right significantly limits our ability to engage in many types of significant transactions on favorable terms (or at all), including, but not limited to, equity and debt financings, liability management transactions, refinancing transactions, mergers, acquisitions, joint ventures and other strategic transactions.

The obligation will continue until the earlier of: (1) December 31, 2048; or (2) December 31 of the third consecutive year during which the annual payment obligation (including in respect of deferred payment amounts) has been less than an amount equal to the Distribution Date Currency Exchange Rate equivalent of $25 million.

CLASS ACTION COMPLAINT

26.    On November 6, 2018, Garrett announced its third quarter 2018 financial results in

a press release that stated, in relevant part:

**Spin-off successfully completed, key business and financial metrics on track as planned, on the way to a strong and successful year**

- GAAP Net Sales of $784 million, up 5%; 7% organic growth*

- Income before taxes of $73 million

- Adjusted EBITDA*of $137 million ($143 million ex-hedging impact*); Margin of 17.5% (18.2% ex-hedging impact*)

- NYSE trading began on Oct 1 and Garrett became an independent public company with decades of industry leadership and strong financial profile

- Issued $1.6 billion in new debt securities at a weighted average cost of 3.2%

27.    On February 20, 2019, Garrett announced its fourth quarter and full year 2018

financial results in a press release that stated, in relevant part:

**Full Year 2018 Highlights**

- Net sales increased 9% to $3,375 million; up 6% organic*

- Net income of $1,180 million, which includes a one-time tax benefit of $879 million

- Adjusted EBITDA*increased 5% to $618 million; up 14% to $656 million excluding the impact from hedging*

- Adjusted EBITDA margin of 18.3% in 2018; Ex-hedging impact* Adjusted EBITDA margin of 19.4%

- Net debt to Consolidated EBITDA* decreased to 2.96x at December 31, 2018 from 3.07x at September 30, 2018

**Fourth Quarter 2018 Highlights**

- Net sales decreased 1% to $799 million; up 2% organic*

- Net income of $43 million

- Adjusted EBITDA* increased 3% to $137 million; up 5% to $141 million excluding the impact from hedging*

- Adjusted EBITDA margin* was 17.1%; Ex-hedging impact Adjusted EBITDA margin* of 17.6%

- Net debt* reduced by $116 million in the quarter to $1,432 million at December 31, 2018

* * *

**Liquidity and Capital Resources**

As of December 31, 2018, Garrett had approximately $689 million in available liquidity, including $196 million in cash and cash equivalents and $493 million available under its revolving credit facility, representing an increase of $92 million in available liquidity since September 30, 2018.

As of December 31, 2018, net debt totaled $1,432 million compared to $1,548 million as of September 30, 2018, a reduction of approximately $116 million. During the fourth quarter 2018, Garrett fully repaid the $98 million related party note and slightly reduced Net Debt to Consolidated EBITDA (as defined in the Credit Agreement) from 3.07x to 2.96x. The weighted average stated interest rate was 3.1% as of December 31, 2018, and Garrett has no significant debt maturities until 2023.

28.     On March 1, 2019, Garrett filed its annual report on Form 10-K for the period ended December 31, 2018 (the "2018 10-K"), affirming the previously reported financial results.  It stated that, after the spin-off, "the Company paid Honeywell $41 million in connection with the Indemnification and Reimbursement Agreement."   Regarding internal control over financial reporting, the 2018 10-K stated:

Our Chief Executive Officer and Chief Financial Officer previously concluded that the Company's disclosure controls and procedures were not effective as of the quarter ended September 30, 2018 as a result of the material weakness in internal control over financial reporting that was identified by Honeywell in August 2018 prior to the Spin-Off related to the estimation in the liability for unasserted Bendix-related asbestos claims. Our financial statements in periods prior to the Spin-Off were derived from the consolidated financial statements and accounting records of Honeywell and reflected an estimated liability for resolution of pending and future asbestos-related and environmental liabilities. Following the Spin-Off, our financial statements are no longer derived from the consolidated financial

CLASS ACTION COMPLAINT
11

statements and accounting records of Honeywell and no longer reflect an estimated liability for resolution of pending and future asbestos-related and environmental liabilities. Because the material weakness disclosed in our Form 10 and our Form 10-Q for the quarter ended September 30, 2018 was solely related to Honeywell's reassessment of its accounting for these liabilities, and because these liabilities are no longer reflected on our balance sheet, management has concluded that the material weakness identified as of September 30, 2018 no longer exists.

29.     On May 7, 2019, Garrett announced its first quarter 2019 financial results in a press release that stated, in relevant part:

**First Quarter 2019 Highlights**

- Net sales totaled $835 million; down 8.7% reported and 3.2% organically*

- Net income increased 25.9% to $73 million

- Earnings per basic and diluted share were $0.98 and $0.97, respectively

- Adjusted EBITDA* decreased 10.2% to $159 million

- Adjusted EBITDA margin* was 19.0%

- Net debt* reduced by $40 million in the quarter to $1,392 million at March 31, 2019

- 2019 outlook unchanged

* * *

**Liquidity and Capital Resources**

As of March 31, 2019, Garrett had approximately $689 million in available liquidity, including $207 million in cash and cash equivalents and $483 million available under its revolving credit facility.

As of March 31, 2019, net debt totaled $1,392 million compared to $1,432 million as of December 31, 2018, a reduction of approximately $40 million. Net Debt to Consolidated EBITDA (as defined in the Credit Agreement) was 3.00x as of March 31, 2019 compared to 2.96x as of December 31, 2018. Garrett's weighted average stated interest rate was 3.1% as of March 31, 2019, and the company has no significant debt maturities until 2023.

30.     On July 30, 2019, the Company announced its second quarter 2019 financial results in a press release that stated, in relevant part:

**Second Quarter 2019 Highlights**

- Net sales totaled $802 million; down 8.6% reported and 3.9% organically*

- Net income totaled $66 million, or basic and diluted earnings per share of $0.88 and $0.86, respectively

- Adjusted EBITDA* decreased 7.8% to $154 million

- Adjusted EBITDA margin* increased to 19.2%

- Net debt* totaled $1,416 million at June 30, 2019

- Revised 2019 guidance driven by lower LV production, slower ramp up LV-Gas launches in China and FX

* * *

- Net debt to Consolidated EBITDA ratio* was 3.20X at June 30, 2019

**<u>Liquidity and Capital Resources</u>**

As of June 30, 2019, Garrett had approximately $669 million in available liquidity, including $182 million in cash and cash equivalents and $487 million available under its revolving credit facility.

As of June 30, 2019, net debt totaled $1,416 million compared to $1,392 million as of March 31, 2019, an increase of approximately $24 million. Net Debt to Consolidated EBITDA (as defined in the Credit Agreement) was 3.20X as of June 30, 2019 compared to 3.0X as of March 31, 2019. Garrett's weighted average stated interest rate was 3.1% as of June 30, 2019, and the company has no significant debt maturities until 2023.

31.     On November 8, 2019, Garrett announced its third quarter 2019 financial results in a press release that stated, in relevant part:

**Third Quarter 2019 Highlights**

- Net sales totaled $781 million, a decrease of 0.4% on a reported basis and an increase of 2.8% organically*

- Net income totaled $38 million, or basic and diluted earnings per share of $0.51 and $0.50, respectively

- Adjusted EBITDA* decreased 2.9% to $133 million; Adjusted EBITDA margin* decreased to 17.0%

- Adjusted Levered Free Cash Flow* totaled $102 million

- Total Debt reduced by $87 million to $1,511 million at September 30, 2019

- Net Debt* reduced by $95 million to $1,321 million at September 30, 2019

- Reiterated 2019 guidance for organic net sales and Adjusted Levered Free Cash Flow conversion; revised full-year outlook for Adjusted EBITDA

- Net Debt to Consolidated EBITDA ratio* lowered to 3.01X at September 30, 2019

* * *

**Liquidity and Capital Resources**

As of September 30, 2019, Garrett had $658 million in available liquidity, including $190 million in cash and cash equivalents and $468 million available under its revolving credit facility.

As of September 30, 2019, total debt was $1,511 million compared to $1,598 million as of June 30, 2019, a decrease of approximately $87 million. As of September 30, 2019, net debt totaled $1,321 million compared to $1,416 million as of June 30, 2019, a decrease of approximately $95 million. Net Debt to Consolidated EBITDA (as defined in the Credit Agreement) was lowered to 3.01X as of September 30, 2019 from 3.20X as of June 30, 2019. Garrett's weighted average stated interest rate was approximately 3.1% as of September 30, 2019, and the company has no significant debt maturities until 2023.

32.    On December 2, 2019, Garrett announced that it had filed a lawsuit against

Honeywell.  In a press release, the Company stated:

Garrett Motion Inc. (NYSE: GTX) today filed a lawsuit in the Supreme Court of the State of New York against Honeywell International Inc. (NYSE: HON), related entities and certain affiliated officers and directors. The lawsuit follows Garrett's unsuccessful efforts to reach a negotiated solution with Honeywell's executive team to avoid litigation.

The lawsuit arises from Honeywell's unilateral imposition of an unusual 30-year Indemnification Agreement on Garrett immediately prior to the spinoff of Garrett in October 2018. This agreement, which was not negotiated at arm's-length, requires Garrett to compensate Honeywell for payments relating to asbestos exposure arising from Honeywell's legacy Bendix automotive brake business, including payments relating to punitive damages and defense costs.

Garrett asserts that requiring it to make these payments to Honeywell is unacceptable as the historical asbestos liability is Honeywell's and not Garrett's. Furthermore, Honeywell has enabled itself to potentially exercise control of key Garrett corporate decisions by inserting a set of loan-like covenants into the 30-year agreement term.

For more than a year since its spinoff, Garrett has attempted to resolve these important governance and financial issues amicably with Honeywell. After repeated, but unsuccessful discussions with Honeywell, Garrett believes it has no alternative but to turn to the Court for relief.

Garrett's decision was the result of a comprehensive analysis undertaken by its management, informed by the input of outside advisors, and made with the approval of its Board of Directors, who believe this unacceptable agreement limits Garrett's ability to reach its full potential.

During its negotiations with Honeywell, despite asserting that Honeywell's agreement is unacceptable, Garrett continued to comply with the terms of the agreement, including making timely quarterly indemnity payments under protest. Garrett's exposure remains capped at $175 million annually throughout the agreement.

33.    On January 16, 2020, the Company issued a press release setting forth the assertions

in its complaint against Honeywell:

Garrett Motion Inc. (NYSE: GTX) today filed the complaint in its lawsuit, initiated on Dec. 2, 2019, against Honeywell International Inc. (NYSE: HON), related entities and certain affiliated individuals in the Supreme Court of the State of New York.

The complaint details how Honeywell and its executives, and not Garrett's current management, devised Garrett's spinoff to offload Honeywell's more than $1 billion legacy Bendix asbestos liability, while saddling Garrett with unconscionable and illegal covenants that unnecessarily limit its ability to control its long term future. Garrett's complaint includes the following assertions:

1. **Top Honeywell executives devised Garrett's spinoff to offload the financial burdens of its asbestos liabilities.** In October 2018, Honeywell

CLASS ACTION COMPLAINT
15

spun off what remained of its Transportation Systems business, primarily a turbocharger business, into what is now Garrett Motion. Garrett's lawsuit arises from Honeywell's unilateral imposition of a 30-year Indemnification Agreement as part of that spin. This agreement requires Garrett to compensate Honeywell for payments made to resolve Honeywell's asbestos liabilities arising from Honeywell's legacy Bendix automotive brake business. That brake business is completely unrelated to Garrett's turbocharger business.

2. **Honeywell did not negotiate the one-sided Indemnification Agreement with Garrett.** Because no rational company would ever voluntarily agree to the egregious terms of the Indemnification Agreement, Honeywell installed one of its own in-house lawyers prior to the spinoff as Garrett's president and sole director for the purpose of forcing these unconscionable terms on Garrett. In addition, Garrett did not have independent legal representation during the spinoff process: Honeywell retained the same lawyers to represent both Honeywell and Garrett in connection with the spinoff. The lawyers blindly acceded to Honeywell's wishes, regardless of the best interest of their other client, Garrett.

3. **The Indemnification Agreement violates New York law.** The Indemnification Agreement purports to illegally require Garrett to indemnify Honeywell for punitive damages, which are meant to punish Honeywell, including for its reckless disregard of the dangers of asbestos. Under New York law, Garrett cannot be required to indemnify Honeywell for any amount attributable to punitive damages or Honeywell's own intentional misconduct, as well as attorneys' fees and related costs incurred in defending against or settling such claims.

4. **Honeywell incorporated onerous and unlawful covenants into the Indemnification Agreement that were uniquely designed to give Honeywell a veto over Garrett's key corporate decisions for 30 years.** These covenants hobbled Garrett's ability, as an independent, publicly traded company, to refinance its debt and engage in corporate transactions, including mergers and acquisitions, that would benefit Garrett and its shareholders. As detailed in the complaint, Garrett has no right to prepay Honeywell, as it would a lender, which leaves Honeywell with control over these decisions by Garrett for 30 years regardless of Garrett's circumstances. The complaint describes how such extensive and long-lasting control by Honeywell over Garrett's affairs has no legitimate basis and is unlawful.

5. **Honeywell is not entitled to indemnification, and has breached the Indemnification Agreement it wrote for itself.** Honeywell denied many of Garrett's requests for information concerning the liability for which it is indemnifying Honeywell, despite Garrett's right to this information and its

attempts for more than a year to obtain it. Honeywell has also failed to establish its right to indemnity for each and every asbestos settlement of the thousands for which it seeks indemnification. Moreover, Honeywell has not allocated between indemnifiable amounts and non-indemnifiable amounts, including punitive damages or intentional misconduct.

34.     On February 27, 2020, the Company announced its fourth quarter and full year 2019 financial results in a press release that stated, in relevant part:

**Fourth Quarter 2019 Highlights**

- Net sales totaled $830 million, an increase of 3.9% on a reported basis and up 6.2% at constant currency*

- Net income totaled $136 million, or $1.79 per diluted share

- Adjusted net income* was $62 million, or $0.82 per diluted share

- Adjusted EBITDA* decreased 1.4% to $137 million; Adjusted EBITDA margin* was 16.5%

- Adjusted free cash flow* totaled $136 million; Adjusted free cash flow conversion* of 219%

- Net debt to consolidated EBITDA ratio* lowered to 2.74x at December 31, 2019

**Full Year 2019 Highlights**

- Net sales totaled $3,248 million, down 3.8% reported and up 0.2% at constant currency*

- Net income totaled $313 million, or $4.12 per diluted share

- Adjusted net income* was $293 million, or $3.86 per diluted share

- Adjusted EBITDA* decreased 6.0% to $583 million; Adjusted EBITDA margin* was 17.9%

- Adjusted free cash flow* totaled $318 million; Adjusted free cash flow conversion* of 109%

* * *

CLASS ACTION COMPLAINT

17

### Liquidity and Capital Resources

As of December 31, 2019, Garrett had $664 million in available liquidity, including $187 million in cash and cash equivalents and $480 million available under its revolving credit facility.

As of December 31, 2019, total debt was $1,443 million, a decrease of approximately $68 million compared to September 30, 2019. As of December 31, 2019, net debt totaled $1,256 million, a decrease of approximately $65 million compared to September 30, 2019. Net Debt to Consolidated EBITDA (as defined in Garrett's Credit Agreement) was lowered to 2.74x as of December 31, 2019 from 2.93x as of September 30, 2019. Garrett's weighted average stated interest rate was approximately 3.15% as of December 31, 2019, and the company has no significant debt maturities until 2023.

35.     The same day, Garrett filed its annual report on Form 10-K with the SEC for the period ended December 31, 2019 (the "2019 10-K"), affirming the previously reported financial results.  Regarding internal controls over financial reporting, the 2019 10-K stated, in relevant part:

As previously disclosed, in the course of preparing our 2018 Form 10-K and our Consolidated and Combined Financial Statements for the year ended December 31, 2018, our management determined that there was a material weakness in our internal control over financial reporting relating to the lack of information, documentation and supporting evidence for our liability to Honeywell under the Indemnification and Reimbursement Agreement (the "Indemnification Liability"). Specifically, despite our requests, we did not receive sufficient information, documents and explanations from Honeywell, including with regard to information provided in Honeywell's actuary report and the amounts of settlement values and insurance receivables.

Throughout the year ended December 31, 2019, management engaged in an active dialogue with Honeywell that resulted in the Company obtaining access to additional information and documentation from Honeywell, including information regarding historical settlement trends, Honeywell's claims management and valuation processes for asserted claims and associated legal expenses, and the nature of insurance receivables and likelihood of recoverability. Additionally, as part of the additional information and documentation we received from Honeywell, we gained increased visibility into the methodology behind, and data sources and inputs included in, Honeywell's actuary report, and engaged our own expert to review and evaluate the report. During the quarter ended December 31, 2019, management completed its remediation activities and tested the design and operational effectiveness of the modified and new controls. As a result of the remediation activities and controls in place as of December 31, 2019, management concluded that we have remediated the material weakness described above.

36.     On April 7, 2020, the Company issued a press release entitled "Garrett Provides

Update on the Impact of COVID-19." Therein, Garrett stated, in relevant part:

> On April 6, 2020, the Company fully drew the remaining funds available under its revolving credit facility of approximately $470 million to increase its financial flexibility in the current environment. With the additional funds, Garrett has supplemented its cash position, which totaled approximately $250 million as of March 31, 2020, including a draw down on the revolver of $66 million in the first quarter. As a result, total liquidity available at the start of the second quarter is approximately $655 million. There are no significant debt maturities before September 2023.

> "The COVID-19 pandemic has created substantial disruption across the global automotive industry and economies around the world," said Olivier Rabiller, Garrett President and CEO. "While our focus has been on safeguarding the health and safety of our employees and supporting our customers and local communities, we are also taking decisive and prudent steps with various stakeholders to enhance our liquidity and preserve the long-term health of the business. Our senior leadership team has navigated downturns in the past and we expect to rely upon our extensive experience and resilient business model to emerge from this crisis as a stronger company."

37.     On May 11, 2020, the Company announced its first quarter 2020 financial results

in a press release, stating, in relevant part:

**First Quarter 2020 Highlights**

- Net sales totaled $745 million, a decrease of 10.8% on a reported basis and 8.5% at constant currency*

- Net income totaled $52 million, or $0.69 per basic share and $0.68 per diluted share

- Adjusted net income* was $68 million, or $0.91 per basic share and $0.89 per diluted share

- Adjusted EBITDA* decreased to $108 million; Adjusted EBITDA margin* was 14.5%

- Adjusted free cash flow* totaled $57 million; Adjusted free cash flow conversion* of 84%

- Net debt to consolidated EBITDA ratio* was 3.01x at March 31, 2020

CLASS ACTION COMPLAINT

\* \* \*

**Liquidity and Capital Resources**

As of March 31, 2020, Garrett had $658 million in total available liquidity, including cash and cash equivalents and funds available under its revolving credit facility.

As of March 31, 2020, consolidated debt was $1,484 million, an increase of approximately $41 million compared to December 31, 2019. As of March 31, 2020, net debt totaled $1,230 million, a decrease of approximately $26 million compared to December 31, 2019. Net Debt to Consolidated EBITDA (as defined in Garrett's Credit Agreement) was 3.01x as of March 31, 2020 versus 2.74x as of December 31, 2019. As a result of the impact of the COVID-19 pandemic, Garrett expects to be unable to comply with this covenant as early as June 30, 2020. Our management is in the process of negotiating with our lenders to obtain an amendment to or a waiver from the covenant. See our Quarterly Report on Form 10-Q for the period ended March 31, 2020 for additional information. Garrett's weighted average stated interest rate was approximately 3.15% as of March 31, 2020, and the company has no significant debt maturities before September 2023.

38.     On June 12, 2020, the Company announced amendments to its credit agreement,

stating in a press release:

In connection with Garrett accomplishing this agreement with its lenders, Honeywell withdrew its previously issued Notice of Default. Garrett believes that Honeywell's action had no merit and was an improper attempt to interfere with Garrett's contractual arrangements with its lenders and to delay Garrett's ongoing litigation against Honeywell concerning a subordinated asbestos indemnity imposed on Garrett in connection with the 2018 spin-off. Garrett has and will continue to take appropriate actions to defend itself against any of Honeywell's attempts to interfere with Garrett's operations as an independent company.

Rabiller also stated, "While the successful completion of the bank amendment is an important step in Garrett sustaining its liquidity, we will continue to explore further opportunities to optimize our capitalization to ensure that the business is positioned for success in an evolving environment. In particular, this crisis has exacerbated the challenges associated with operating under the onerous Honeywell Subordinated Indemnity and Mandatory Transition Tax (MTT) liabilities, and highlights the fact that the current situation with Honeywell continues to adversely impact our overall strategic and financial flexibility." As of March 31, 2020, the liability on Garrett's balance sheet associated with Honeywell totaled $1,304 million, including the subordinated indemnity liability, MTT payments and other related tax matters.

39.     On July 30, 2020, Garrett announced its second quarter 2020 financial results in a

press release that stated, in relevant part:

**Second Quarter 2020 Highlights**

- Net sales totaled $477 million, a decrease of 40.5% on a reported basis and 39.2% at constant currency*

- Net loss totaled $9 million, or ($0.12) per basic and diluted share

- Adjusted net income* was $5 million, or $0.07 per basic and diluted share

- Adjusted EBITDA* decreased to $63 million; Adjusted EBITDA margin* was 13.2%

- Adjusted free cash flow* totaled ($174) million

- Secured net debt to consolidated EBITDA ratio* was 3.07x at June 30, 2020

**First Half 2020 Highlights**

- Net sales totaled $1,222 million, a decrease of 25.4% on a reported basis and 23.6% at constant currency*

- Net income totaled $43 million, or $0.57 per basic and diluted share

- Adjusted net income* was $73 million, or $0.97 per basic share and $0.96 per diluted share

- Adjusted EBITDA* decreased to $171 million; Adjusted EBITDA margin* was 14.0%

- Adjusted free cash flow* totaled ($117) million

* * *

**Liquidity and Capital Resources**

As of June 30, 2020, Garrett had $482 million in available liquidity, including $139 million in cash and cash equivalents and approximately $347 million undrawn commitments under its revolving credit facility, partially offset by $4 million in uncommitted debt.

As of June 30, 2020, consolidated debt was $1,572 million, an increase of approximately $88 million compared to March 31, 2020. As of June 30, 2020, net

debt totaled $1,433 million, an increase of approximately $203 million compared to March 31, 2020. Secured Net Debt to Consolidated EBITDA (as defined in Garrett's amended credit agreement) was 3.07x as of June 30, 2020 versus 2.44x as of March 31, 2020. During the second quarter of 2020, Garrett reached an agreement with its senior lenders under the credit agreement to, among other items, amend certain covenants and conditions, including a modified maximum leverage ratio and a waiver of the interest coverage ratio requirements for up to a two-year period through June 30, 2022. Garrett's weighted average stated interest rate was approximately 3.6% as of June 30, 2020, and the company has no significant debt maturities before September 2023.

40.     The above statements identified in ¶¶ 23-39 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) because of Garrett's agreement to indemnify and reimburse Honeywell for certain asbestos-related liability, the Company was saddled with an unsustainable level of debt; (ii) as a result, Garrett had a highly leveraged capital structure that posed significant challenges to its overall strategic and financial flexibility; (iii) as a result of the foregoing, Garrett's ability to gain or hold market share was impaired; (iv) as a result of the foregoing, the Company was reasonably likely to seek bankruptcy protection; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## The Truth Begins to Emerge

41.     On August 26, 2020, before the market opened, the Company announced that it would explore alternatives to address certain balance sheet concerns.  Garrett also stated that its "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers."  The press release further stated, in relevant part:

In addition, Garrett's high leverage is exacerbated by significant claims asserted by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and the tax matters agreement. These arrangements were a part of an inappropriate capital structure imposed by Honeywell on Garrett as part of its 2018 spin-off that has proven ill-suited to cope with any meaningful challenges at the macroeconomic level, much less those Garrett faces amid a global pandemic. As previously disclosed, payment on the disputed claims by Honeywell has been generally deferred until the second quarter of 2023, but the possibility of the disputed claims being payable in the future – combined with Garrett's high leverage and competitive situation – create a substantial additional overhang on Garrett's balance sheet and impede Garrett's access to capital and its ability to execute its strategy. As a result, Garrett sees a substantial risk that it will not be able to distribute value to its stockholders in the future, despite its strong operating performance and compelling business prospects.

Garrett is seeking to address its balance sheet concerns while its core business remains strong in order to preserve the resources necessary to provide exceptional service to its customers, be a reliable partner to its suppliers and other stakeholders, and act as a stable and desirable employer. Garrett has ample liquidity to support its current and future commitments to customers, suppliers, employees and other business partners without interruption, with available cash and undrawn revolver capacity totaling $482 million as of June 30, 2020.

42.     On this news, Garrett's stock price fell $3.04 per share, or over 44%, to close at $3.84 per share on August 26, 2020, thereby damaging investors.

43.     On Sunday, September 20, 2020, Garrett announced that it had filed for Chapter 11 bankruptcy.  In a press release, the Company stated, in relevant part:

- Company enters into a definitive agreement with KPS to serve as stalking horse bidder to purchase the business for $2.1 billion, subject to adjustment

- Company voluntarily files for Chapter 11 protection, with support of holders of approximately 61% of its outstanding senior secured debt, to address balance sheet issues and facilitate the purchase

- Company seeks court approval for $250 million debtor-in-possession financing facility to bolster liquidity position

- Company expects to operate without interruption, including serving its customers and continued partnerships with its valued suppliers in the ordinary course of business

44.     On Monday, September 21, 2020, the NYSE announced that it would commence proceedings to delist Garrett's stock from the NYSE after the Company's disclosure that it had filed for bankruptcy.

45.     On this news, Garrett's stock began trading over-the-counter and closed at $1.76 per share on September 22, 2020, an over 12% decline from the closing price on September 18, 2020.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Garrett securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Garrett's common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Garrett shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Garrett or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

50. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Garrett; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

51. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

52. The market for Garrett's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements, and/or failures to disclose, as alleged herein, Garrett's securities traded at artificially inflated prices during the Class

Period.   Plaintiff and other members of the Class purchased or otherwise acquired Garrett's securities relying upon the integrity of the market price of the Company's securities and market information relating to Garrett, and have been damaged thereby.

53.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Garrett's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.   The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Garrett's business, operations, and prospects as alleged herein.

54.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.   As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Garrett's financial well-being and prospects.   These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

55.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

56.     During the Class Period, Plaintiff and the Class purchased Garrett's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

57.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Garrett, their control over, and/or receipt and/or modification of Garrett's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Garrett, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

58.     The market for Garrett's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Garrett's securities traded at artificially inflated prices during the Class Period.  On April 24, 2019, the Company's share price closed at a Class Period high of $19.36 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying

CLASS ACTION COMPLAINT

upon the integrity of the market price of Garrett's securities and market information relating to Garrett, and have been damaged thereby.

59.     During the Class Period, the artificial inflation of Garrett's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Garrett's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Garrett and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

60.     At all relevant times, the market for Garrett's securities was an efficient market for the following reasons, among others:

(a)     Garrett shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Garrett filed periodic public reports with the SEC and/or the NYSE;

(c)     Garrett regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Garrett was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

61.     As a result of the foregoing, the market for Garrett's securities promptly digested current information regarding Garrett from all publicly available sources and reflected such information in Garrett's share price.  Under these circumstances, all purchasers of Garrett's securities during the Class Period suffered similar injury through their purchase of Garrett's securities at artificially inflated prices and a presumption of reliance applies.

62.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

63.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Garrett who knew that the statement was false when made.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

64.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Garrett's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

66.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Garrett's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

67.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Garrett's financial well-being and prospects, as specified herein.

68.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Garrett's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Garrett and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

69.     Each of the Defendants' primary liability and controlling person liability arises from the following facts: (i) Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports;

(iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

70.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Garrett's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Garrett's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that

was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Garrett's securities during the Class Period at artificially high prices and were damaged thereby.

72.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Garrett was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Garrett securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and/or sales of the Company's securities during the Class Period.

## <u>COUNT II</u>

### (Violations of Section 20(a) of the Exchange Act Against All Defendants)

75.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

76.     Defendants acted as controlling persons of Garrett within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendants had the power to influence and control and did

influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.      In particular, Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.      As set forth above, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  November 5, 2020                    Respectfully submitted,


**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, _____Joseph Froehlich_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Garrett Motion Inc. ("Garrett" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Garrett securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Garrett securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      To the best of my current knowledge, the attached sheet lists all of my transactions in Garrett securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury that the foregoing is true and correct.



Executed ____10 / 9 / 2020____
            **(Date)**


_____
            **(Signature)**


____Joseph Froehlich____
        **(Type or Print Name)**

**Garrett Motion Inc. (GTX, GTXMQ)**                                            **Froehlich, Joseph**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/8/2019 | 1,519 | $16.4500 |
| Sale | 9/17/2020 | (1,519) | $2.1666 |